STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-062
GAB - YOR - 5/14/2001

SQUARE POND MARINA and
PATRICK HANNON,

        Plaintiffs

v.

JUDGMENT

TOWN OF SHAPLEIGH, RUTH HAM,
MICHAEL PERRO and EDWARD WOOD,[1]

        Defendants

Pending are Plaintiffs' Rule 80B Appeal and cross-motions for summary judgment. Following hearing and review of the written submissions, the Rule 80B Appeal is Denied and summary judgment is Granted in favor of Plaintiffs on Defendants' complaint for injunctive relief on the basis of the affirmative defense of equitable estoppel.

FACTUAL BACKGROUND

In the early 1980s William and Meredith Plummer, the previous owners of the Square Pond Marina, were granted a permit from the Town which allowed them "[i]n an already existing store selling marine hardware and accessories . . . to set aside an area to sell milk, bread products, relish, ketchup, etc. and to install a dairy bar." R. 258-62[2]. At the time this permit was granted the Marina property was

_____

1 Ham, Perro and Wood are selectmen of the Town of Shapleigh.

2 (R. ) refers to 80B record references.

located in the General Purpose Zone. **R. 258-62.** The location of the property has since been reclassified and is now within the Shoreland Zone. Eating establishments are not permitted within this zone. **R. 174-75.**

In October 1996, Patrick Hannon entered a Lease and Purchase Agreement with the Plummers.[3] **Attachment to Plaintiffs' Summary Judgment Reply Brief, R. 247-48.** Hannon took title to the Marina property on October 1, 1997. At the time Hannon bought the Marina, the Marina maintained tables for consumption of the food prepared on the premises. There were two or three tables indoors and four tables outdoors. **R. 12, 21-22.** The food service area occupied approximately 2,400 square feet. **R. 12, 20.** Prior to Hannon taking possession of the Marina, Mr. Plummer applied for and was issued building permits that allowed him to renovate the first floor of a residential building on the property. **R. 30, 121-25.** At a meeting of the Planning Board held on January 28, 1997, Hannon introduced to the Planning Board a permit application to use the former variety and food service area for video games (approximately 25 games). **R. 237-42.** At a public hearing and meeting held on February 11, 1997, Hannon noted that the food service had been moved to the former residence building. **Plaintiff's Statement of Material Facts (PSMF) ¶ 14.** The Planning Board approved the permits submitted at the January 28 meeting. **R. 232-236.**

---

[3] Mr. Hannon currently owns the property, but leases the land and buildings to Square Pond Marina to operate the business.

The Marina, including the new food service area, opened for business in the spring/summer of 1997. PSMF ¶ 18. Hannon removed the snack bar from the marine supply store and converted the residence on the property into a restaurant with 14 tables (5 inside and 9 outside) and a more extensive menu. PSMF ¶ 18, R. 25-26. Presently, this food service area occupies 1,600 square feet. R. 12.

The plumbing permit for the fryolators and sinks, necessary to operate the restaurant, was issued on April 16, 1997 after the CEO inspected the premises. PSMF ¶ 16-17. Hannon states that it was at this time that he had to go to the planning board to get approval for outside seating and a wait staff. According to Hannon, the Planning Board said they didn't have to make a ruling because the use was grandfathered. Hannon Deposition (Yellow Folder), p. 48-52.

On October 1, 1997, after an inspection by the CEO, the CEO issued a letter citing conditional use violations. PSMF ¶ 19. Among other items, the letter stated that "[t]he sign in front of the Restaurant is to be only 8 square feet not 25 square feet" and that the "[d]eck in front of Restaurant has been enlarged. Needs permit." Id. On October 20, 1997, in response to the CEO's October 1, 1997 letter, the Marina submitted a building permit application to enlarge the deck. The application was approved on October 21, 1997. PSMF ¶ 23. On November 4, 1997 Square Pond Marine applied for 4 sign permits advertising Square Pond Restaurant. On December 9, 1997 the CEO approved this permit. PSMF ¶ 24.

On February 18, 1998, the CEO issued a letter informing Hannon that the signs located at the restaurant were not in compliance with the Town code because it

3

advertised "BYOB" consumption of alcohol at the restaurant. PSMF ¶ 25. On March 25, 1998 the CEO revoked this cease and desist order relating to the "BYOB" policy at the restaurant. PSMF ¶ 26. The CEO had apparently reconsidered his earlier position and now opined that alcoholic beverages could be "brought into and consumed by customers at the restaurant as long as entertainment is not allowed." Id.

On March 25, 1998, the CEO, the Chair of the Board of Selectmen and the Chair of the Planning Board all received a letter from Ron Cheney, the former manager of the Marina. PSMF ¶ 14. In this letter Mr. Cheney complained that Hannon was operating a restaurant in violation of the Town's zoning ordinance. Id. At a meeting of the Planning Board held on April 14, 1998, the Planning Board turned the matter over to the CEO, James Gerrish, for "appropriate action." PSMF ¶ 32.

On May 27, 1998 the Department of Human Services approved the septic design for the restaurant to accommodate "21 seats inside and 23 seats outside with an ice cream takeout and five employees. PSMF ¶ 16. The Shapleigh CEO was sent a copy of this letter. Id. On May 30, 1998, the CEO issued a septic permit for the installation of a septic system to handle twenty-one inside seats and twenty-three outside seats at the Marina property. R. 194-208.

In July of 1998, Hannon ran an ad in a local newspaper advertising the "Square Pond Restaurant" with "lakeside dining on our covered deck" and "new china and wait staff." Defendants' Statement of Material Facts (DSMF) ¶ 52.

4

On January 21, 2000 the CEO issued a cease and desist order ordering Hannon to stop using the Marina as an eating establishment and to remove certain food preparation equipment which Hannon installed.[4] R. 4-5. Hannon appealed this order to the Shapleigh Board of Appeals. The Board of Appeals denied his appeal on April 3, 2000. R. 12-14.

Plaintiffs now appeal the Board of Appeals' decision. This 80B appeal is Count II of the amended Complaint. Count I is a request for declaratory relief in which Plaintiffs assert that the Town is estopped from enforcing the provisions of the zoning ordinance which prohibit the operation of a restaurant on Plaintiffs' property. The Defendants have counterclaimed seeking an order enjoining Hannon and Square Pond from operating the restaurant and awarding the Town civil penalties attorney fees.

RULE 80B APPEAL

Plaintiffs' Argument

The Board of Appeals' conclusion that the Marina's eating establishment was not a pre-existing nonconforming use, is erroneous as a matter of law and is not supported by the evidence in the record. Eating establishments are not permitted within the Shoreland District. Nevertheless, the Ordinance provides that a use in existence before the codification of the Ordinance may remain as a nonconforming use. The Marina's restaurant is a grandfathered nonconforming use. A pre-existing

---

[4] Plaintiff is not contesting the Cease and Desist Order as it relates to the food preparation area and has agreed to remove equipment as required by the CEO's January 21, 2000 letter.

5

use will lose its nonconforming status only if it is discontinued or impermissibly expanded.

The Marina did not impermissibly expand the nonconforming use as a dairy bar serving food to a restaurant. There must be a substantial change or difference in character before condemning as unlawful an extension of a nonconforming use. A mere increase in the amount or intensity of the nonconforming use within the same area does not constitute an improper expansion of the nonconforming use.

In this case, the eating area was remodeled, but the overall size of the eating area was reduced. Second, the menu was upgraded. These changes do not alter the Marina's operation as an eating establishment. Upgrading an eating establishment's menu and decor alone cannot change the character of the establishment.

Defendants' Argument

While a nonconforming use is permitted to continue, that permission is limited to the same use that was in lawful existence at the time the ordinance made it nonconforming. Under the Shapleigh Ordinance, a nonconforming use cannot be extended to any floor area within a building or to any building that was not occupied by the use on the effective date. On this basis alone, the relocation of the food service from the building which formerly housed the marine supplies store into a building which was a house at the time the snack bar came into existence, was unlawful.

The Board of Appeals also considered whether, irrespective of the relocation, there had been an unauthorized change of use. In this case, there was ample

6

evidence before the Board of Appeals that the new restaurant use is different in nature, purpose, quality and character - not just in degree - from the old grocery/dairy bar.

## DECISION

Because they are asserting "grandfathered" rights to a nonconforming use, Plaintiffs had the burden of proving to the Board of Appeals that their use was not a change in the nonconforming use. Total Quality, Inc. v. Town of Scarborough, 588 A.2d 283, 284 (Me. 1991). Once the Board has made its findings, the Court reviews the board of appeals' decision only for abuse of discretion, errors of law, or findings of fact not supported by substantial evidence in the record. Id. Substantial evidence exists when a reasonable mind would rely on that evidence as sufficient support for a conclusion; the possibility of drawing two inconsistent conclusions does not render the evidence insubstantial. Adelman v. Town of Baldwin, 2000 ME 91, ¶ 12, 750 A.2d 577, 583. To vacate the Board of appeals decision, Plaintiffs must demonstrate that no competent evidence supports the Planning Board's conclusions. Id.

At the time the Town granted a permit to the Plummers to prepare and sell food the Marina property was located in the General Purpose Zone. Later on, this location was subject to rezoning and now falls within the Shoreland District.[5] "Eating establishments" are not permitted within the Shoreland District. Shapleigh Zoning Ordinance § 105-17, R. 174-75. However, the Ordinance provides that a use

---

[5] It is unclear when this rezoning occurred.

in existence before the Ordinance was effective may remain as a nonconforming use. Ordinance § 105-4(B), **R. 153.** A pre-existing use will lose its nonconforming status only if is it discontinued or impermissibly expanded. Ordinance § 105-4(C)(5), **R. 153-54.**

The only real issue in this case is whether changes to the "eating establishment" created an impermissible expansion of the nonconforming use. Section 105-4(C)(5) states:

> Expansion. A nonconforming use, including a nonconforming open use of land, shall not be extended or expanded in area or function, unless the following conditions are met:

> (b) A nonconforming use may not be extended to any building or other structure or land area other than the one(s) occupied by such use on the effective date of this chapter, except when the use of the building or structure is changed from a nonconforming to a conforming use. . .

Thus, the plain language of the Ordinance alone prohibits exactly the situation before the Court: the snack bar/restaurant was extended to another building other than the building occupied by the snack bar on the effective date. Section 105-4(C)(5) comports with the notion that "[t]he spirit of the zoning ordinances and regulations is to restrict rather than increase any nonconforming uses, and to secure their gradual elimination." Brooks v. Cumberland Farms, Inc., 1997 ME 203, ¶ 16, 703 A.2d 844, 848.

Plaintiffs rely on Frost v. Lucy 231 A.2d 441, 447 (Me. 1967) for the proposition that there must be a "substantial change or difference in character before condemning a use as an unlawful extension of a nonconforming use." The Court further stated that "where the original nature and purpose of the enterprise remain

8

the same, and the nonconforming use is not changed in character, mere increase in the amount or intensity of the nonconforming use within the same area does not constitute an improper expansion or enlargement of such nonconforming use." Id. at 448.

In Frost the Court upheld a hotel's expansion from a seasonal operation to year-round use, but disallowed conversion of the hotel's dining room from a private dining room to a public dining room. The Court reasoned that the Ordinance did not prohibit extension or enlargement of the nonconforming use in time - whether in the number of hours, days, weeks or months during which the activity may be carried on. Id. at 449. However, the Court found that the operation of a public restaurant was a substantial departure as a matter of fact from maintaining a hotel with incidental dining room facilities for hotel guests. Id.

In the present case, the Board of Appeals also considered whether, irrespective of the relocation, there had been an unauthorized change in use. The test for determining whether a change of use fits within the "grandfathered" use is :

> "(1) whether the use reflects the 'nature and purpose' of the use prevailing when the zoning legislation took effect; (2) whether there is created a use different in quality or character, as well as in degree, from the original use, or (3) whether the current use is different in kind in its effect on the neighborhood." Keith v. Saco River Corridor Commission, 464 A.2d 150, 155 (Me. 1883).

In this case, there was sufficient evidence before the Board of Appeals that the new restaurant was different in quality or character from the original use. The record shows that the original operation was a small, incidental component of the marina business: "[i]n an already existing store selling marine hardware and

9

accessories" the original permit allowed the Plummers to have a "dairy bar to serve ice in cones, sundaes, frappes and banana splits." R. 262. At the time Hannon purchased the property, the dairy bar had added a few items (hot dogs, pizza etc. ) that were served over a counter and there were two or three tables inside and four tables outside. R. 21-22. The snack bar provided counter service only. R. 22. The restaurant currently has fourteen tables (R. 24-25), a wait staff, china and a menu that includes lobster, char-broiled steaks, ribs and buffalo wings. **Defendant's Exhibit 2 (Yellow Folder)**. Although the restaurant does not serve alcohol, BYOB is permitted. **Id., Summary Judgment Motion, Ex. 11.** A state inspector from the Department of Human Services determined that the "eating establishment" needed to be licensed as a restaurant by DHS. R. 217.[6]

As well, during the public hearing, the Board heard from several members of the public that there had been a substantial change. One summer resident stated: "the people that I know just enjoy this place on a Thursday night or a Friday night or a Saturday night. It's nice to give mom the night off and go down there and have a meal." R. 57. Another neighbor stated that: "I know what it was like before and what it's like now. The appearance has certainly changed tremendously, which had made it very nice for us. We have enjoyed going next door, ourselves, to eat. We have a lot of friends that have. And, in fact, last spring, I had people from Sanford, relatives, calling me to see if it would open and when could they come for a visit." R. 59-60.

---

[6] This record reference refers to the letter Ron Cheney wrote to the Town. In this letter he claims that the health inspector from DHS determined that a restaurant was being operated. This information was not disputed by Plaintiffs.

The above evidence demonstrates that the existing restaurant is quite a different sort of enterprise from the snack bar that existed. The Board of Appeals correctly upheld the CEO's determination that the restaurant was an impermissible expansion of the grandfathered use.

## SUMMARY JUDGMENT

### Res Judicata

At the April 3, 2000 Zoning Board hearing, Plaintiffs' attorney raised the issue of "estoppel." R. 13, 18-19. The Town's attorney instructed the Board that it did not have the authority to rule on the doctrine of estoppel and that such doctrine is only for the courts to apply. R. 63-64. However, it seems as though both attorneys were referring to the issue of equitable estoppel. "It is well established that a claim of *res judicata* is waived if not raised in the pleadings." Currier v. Cyr, 570 A.2d 1205, 1209 (Me. 1990); M.R. Civ. P. 8(c). Plaintiffs did not raise *res judicata* in their pleading and therefore cannot now argue this theory.

In any event, Plaintiffs' *res judicata* argument fails. The Plaintiffs argue that the ZBA has previously determined that the restaurant is a permitted use of that property. In its decision of March 2, 1998 on the Marina's application for a variance for a new gas storage tank, the ZBA found that the Marina property could yield a reasonable return because: "[t]he Marina has a restaurant, boat launching, repair and storage capabilities and would have some economic return without the selling of gasoline." PSMF ¶ 28. Plaintiffs argue that only permitted uses of a property can be used to analyze whether a property can yield a reasonable return, therefore, the ZBA

11

implicitly found that the Marina's use of the property as a restaurant was permitted because it found that its use as a restaurant was a factor in its conclusion that the property provided a reasonable return.

The cases cited by Plaintiff do support the proposition that only permitted uses of a property can be used to analyze whether a property can yield a reasonable return. Twigg v. Town of Kennebunk, 662 A.2d 914, 918-19 (Me. 1995); Brooks v. Cumberland Farms, Inc., 1997 ME 203, ¶ 14, 703 A.2d 844, 848. However, "[The] form of *res judicata* called 'collateral estoppel' or 'issue preclusion' 'prevents the reopening in a second action of an issue of fact actually litigated and decided in an earlier case." North Berwick v. Jones, 534 A.2d 667, 669-70 (Me. 1987)(citations omitted).[7] Although the Board knew that a restaurant existed, and that an eating establishment was a grandfathered and thus permitted use within the Shoreland District, whether or not the current eating establishment exceeded the scope of the grandfathered use was not at issue and therefore not decided at the March 1998 hearing.

For the above reasons, the Town is not barred by the doctrine of *res judicata* from litigating the issue of whether the Square Pond Restaurant is a permitted use within the Shoreland District.

---

[7] The doctrine of *res judicata* applies in the context of administrative proceedings. North Berwick v. Jones, 534 A.2d at 670.

12

## EQUITABLE ESTOPPEL

### Plaintiffs' Argument

The Town is equitably estopped from enforcement of its cease and desist order because Plaintiffs relied upon the Towns' representations and acts and invested time and money on the restaurant, which they reasonably believed was a permitted, grandfathered use within the shoreland district.

The plaintiffs in this case sought permission from the Town to move and expand the food service/restaurant. Even before Hannon purchased the Marina, the Town issued building permits to the previous owner, allowing him to convert a residential building into a food service and grocery sales area. More importantly, once Hannon purchased the Marina, he sought and was granted 4 sign permits, a conditional use permit, a modification to the conditional use and building permit, a septic system permit, a variance, and a plumbing permit, most of which required physical inspection of the property and all of which specifically referenced either "the restaurant" or a food service. The Town never objected to plaintiffs' use of the property as a restaurant. Instead, the Town sat back and allowed the plaintiffs to invest substantial time, effort and expense to improve the restaurant before changing course in January 2000 and issuing a cease and desist order. Plaintiffs' reliance on numerous written permits, coupled with numerous inspections, all of which established a course of conduct by the officials authorized to act in this area, reasonably indicated the Town's official position that the restaurant was a grandfathered use permitted on the Marina property.

13

Defendants' Argument

1.  The town cannot be estopped by representations made to Plaintiffs by a third party.

Equitable estoppel requires proof that the plaintiff relied upon declarations or acts of the defendant and was thereby induced to do something to his detriment, something which he otherwise would not have done. Consequently, there must be some actual communication between the two parties before there is even the possibility of detrimental reliance. In this case, Hannon has admitted that he entered into a binding agreement to purchase the Square Pond Marina without first talking to any official from the Town of Shapleigh. No Town official induced him to do anything.

2.  Plaintiffs' reliance on second hand information about the Town's zoning requirements was not reasonable.

Hannon made no attempt at all to contact Town officials and find out whether he could operate a restaurant before he agreed to purchase the Marina. He did not consult a lawyer. He did not seek advice from any professional or consultant about zoning and land use issues. He did go to the Shapleigh Town Office and obtain a copy of the zoning ordinance but he did not read it in detail and paid no attention to the provisions placing restrictions on expanding and changing a non-conforming use. Hannon Deposition, p. 32-34.

A party claiming an estoppel must have used due diligence to ascertain the truth of the matters upon which he relies in acting to his detriment. Yet in

14

acquiring the Marina, Hannon never contacted the Town's CEO to ask about opening a restaurant.

3.      The Town cannot be estopped by representations it made after Plaintiff bought the property and opened the restaurant.

Even looking at what occurred between the time Hannon entered into a contract to buy the property in late 1996 and the time they closed (October 1997), none of the statements made by any Town official could reasonably be construed as assuring Plaintiffs that they could convert the minimal food service to the restaurant that Plaintiffs not operate.[8]

4.      The Town cannot be estopped by any unauthorized statements of its employees of officials.

A municipality cannot be estopped from enforcing the actual requirements of its zoning ordinance simply because an official made unauthorized or erroneous statements the property owner. Plaintiff points to various communications from the Town's CEO and by the Town's Planning Board, neither of which was authorized by the Shapleigh Zoning Ordinance. Under § 105-4(C)(4) of the Ordinance, only the ZBA can approve a change in a non-conforming use. R. 153. Thus, even if the CEO or Planning Board had told Plaintiffs they could change the use, any such misrepresentations could not prevent the Town from enforcing its Ordinance.

---

[8] The Defendants argue that although Plaintiffs make much of the fact that after Plaintiffs began operating the restaurant, the Town acknowledged the existence of the restaurant, the point of "reliance" was the point at which Hannon entered into the agreement with Plummer to buy the property. At this point, Hannon had had absolutely no communication with the Town.

15

At the core of this case is not whether the Town made a single representation upon which plaintiffs relied to their detriment, but whether the Town made a series of representations and issued a series of permits, upon which over the course of several years the plaintiffs relied and expended substantial funds, well after the Town knew or should have known that the Square Pond Restaurant was operating in the shoreland zone.

In essence, the Town is advancing the proposition that applicants for permits obtain permits at the risk of having the Town disavow the authority of the issuing officer. Plaintiffs submitted permit applications to the only officials the Town authorized to receive and process those applications and acted upon the reasonable belief that the permits were issued to a validly existing, permitted and grandfathered use in the shoreland zone.

## DECISION

Equitable estoppel may be applied to the activities of government officials or agencies in discharging their duties. Maine School Admin. Dist. No. 15 V. Raynolds, 413 A.2d 523, 533 (Me. 1980). To prevail on a claim for equitable estoppel the Plaintiffs need to establish that they relied upon declarations or acts of the Town and were thereby induced to do something to their detriment, something which they otherwise would not have done. See Shackford & Gooch, Inc. v. Town of Kennebunk, 486 A.2d 102, 105-06 (Me. 1984). Furthermore, the reliance upon which

16

estoppel is claimed must have been reasonable.[9] Id. at 106. As well, equitable estoppel requires misrepresentations, including "misleading statements, conduct or silence, that induce detrimental reliance." Department of Human Services v. Bell, 1998 ME 123, ¶ 8, 711 A.2d 1292, 1295. The Law Court has cautioned that the doctrine of equitable estoppel should be "carefully and sparingly applied." Town of Union v. Strong, 681 A.2d 14, 19 (Me. 1996). The party seeking to estop the enforcement of a zoning ordinance bears a greater burden of proof because of the "'forceful public reasons that militate against restricting the enforcement of municipal ordinances.'" Id.

Plaintiffs do not argue that they relied on the Town's inaction or silence on the issue of the restaurant to their detriment.[10] Rather, Plaintiffs argue that the Town officials' statements and affirmative conduct in issuing various permits induced them to rely to their detriment. The Town argues that Plaintiffs cannot rely on events that occurred after Hannon took title to the property and began operating the restaurant. The Town's position is that the point of "reliance" - the point at which Plaintiffs changed their position was at the point at which Hannon entered

---

[9] The parties argue over whether or not the party claiming estoppel must have used due diligence to ascertain the truth of the matter upon which he relies. The Town argues that Hannon's lack of diligence in ascertaining whether or not he could operate a restaurant precludes him from now claiming equitable estoppel. The Town cites caselaw from other jurisdictions to support this argument. See e.g., Barfield v. Howard M. Smith Co. Of Amarillo, 426 S.W.2d 834, 838 (Tex. 1968); Hampton v. Paramount Pictures Corporation, 279 F.2d 100, 104 (9th Cir. 1960). There are no Maine cases requiring the party claiming estoppel to have exercised due diligence, however, this requirement could somewhat be encompassed within the principle that the plaintiff's reliance must be reasonable.

[10] If this were the case Plaintiffs would have to show by "clear and satisfactory" proof that the Town was silent when they had a duty to speak. See Department of Human Services v. Bell, 1998 ME 123, ¶ 8, 711 A.2d at 1295.

17

into the agreement with Plummer to buy the property. Logically, there can be no reliance when a claimant has taken action before any statements were made or alleged affirmative conduct occurred.

The Town accurately notes that Hannon never made any inquiries regarding the zoning status of the property prior to entering the Lease and Purchase Agreement. Hannon Deposition, Yellow Folder, p. 27, 29-30, 32, 34. Hannon apparently gave no thought as to whether the food service aspect of his business was a grandfathered use when he first signed the Lease and Purchase Agreement. Hannon Deposition, Yellow Folder, p. 68. However, before the lease expired and before Hannon purchased the Marina, it seems that Hannon reasonably assumed that food service was a grandfathered use. Hannon Deposition, Yellow Folder, p. 48-52.

The Marina applied for a plumbing permit for a fryolator and sinks, necessary for the operation of the restaurant, on April 15, 1997, approximately six month before Hannon took title to the Marina. Attachment to PSMF, Exhibit 5. The premises were inspected and the permit was granted. Id. Hannon states that it was at this time that he went to the Planning Board to get approval for outside seating and a wait staff. Hannon Deposition, Yellow Folder, p. 48. According to Hannon, the Planning Board said they didn't have to make a ruling because the use was grandfathered. Id.[11] Therefore, it appears that prior to purchasing the Marina, and

_____

[11] As well, according to selectman Ruth Ham, CEO James Gerrish felt that the use was grandfathered. Deposition of Ruth Ham, p. 31-32, Attachment to Plaintiffs' Summary Judgment Reply Brief.

18

prior to opening the new restaurant, Hannon was informed that food service was a grandfathered use.

As well, it appears that events that took place after Hannon purchased the property can be considered. In a similar case, City of Auburn v. Desgrosseilliers, 578 A.2d 712 (Me. 1990), the Law Court examined the totality of the circumstances and took into account events occurring after the plaintiffs had begun operating their business. In Desgrosseilliers, the plaintiffs met with a city official to discuss operating a multibusiness operation in Auburn consisting of a gift shop, photographic studio, landscaping business and tree nursery. Id. at 712. A city official helped the Plaintiffs draw up a petition to request a change in the zoning district from the Urban Residence zone to the General Business zone in order for Plaintiffs to establish their business at the proposed site. The Plaintiffs submitted their plan to the Planning Board, again disclosing that they planned to operate, among other things, a landscaping business and tree nursery. Id. at 713. The zoning change was approved by the Planning Board and City Council. Neither the town official, nor the Planning Board and City Council informed the Plaintiffs that landscaping services and tree nurseries were not permitted in the General Business zone. The Plaintiffs began conducting their multi-business operation in 1985 and during the following three years sought and received permits to display signs on their property that showed that the Plaintiffs operated a nursery and landscaping business. Id. at 714-15. The City did not give them any indication that their business activities were illegal until 1987, and did not commence an enforcement action until 1988. Id. at 713, 715.

In reaching the conclusion that the City could be equitably estopped from enforcing the ordinance, the Law Court stated that " the City misled the Desgrosseilliers into investing in their landscaping service and nursery business in 1985, failed to give them any indication that their business activities were illegal until 1987, and did not commence an enforcement action until 1988."[12] Id. at 715.

The analysis and result in Desgrosseilliers would seem to indicate that the entire relationship and series of events between Plaintiffs can be examined - not just those leading up to the point at which Hannon entered into the agreement to purchase the Marina. It would appear, however, that the examination of the record should be restricted to statements/conduct by the town officials regarding the restaurant - and not regarding various other aspects of the property in which the restaurant was merely mentioned. See Town of Falmouth v. Long, 578 A.2d 1168, 1169 & n. 3, 1170 (Me. 1990)(denying plaintiffs equitable estoppel claim because the alleged misrepresentations made by Town officials concerned other, unrelated aspects of the business in question).

The representations or affirmative conduct made by the Town regarding the restaurant include the following:

1.      October 1, 1997 the CEO issued a letter to Hannon citing, among other violations that (i) the sign on the front of the restaurant violated the Town's sign ordinance and (ii) the deck in front of the restaurant had been enlarged and needed a permit. Attachment to PSMF, Exhibit 6.

---

12 Although the delay in enforcing the ordinance was not determinative of the estoppel issue, the Court did consider it a factor to be weighed. Id.

2. October 14, 1997, Planning Board approved a requested change in the operating hours of the marina, restaurant and arcade. The minutes of this meeting reflect that the Board approved a "traditional hunters breakfast" during deer hunting season beginning at 4am. Attachment to PSMF, Exhibit 7.

3. October 20, 1997, in response to the CEO's letter of October 1, 1997, the Marina submitted a building permit to enlarge the deck. The application was approved on October 21, 1997. Attachment to PSMF, Exhibit 8.

4. December 9, 1997, CEO approved permit application for 4 signs advertising Square Pond Restaurant. Attachment to PSMF, Exhibit 9.

5. February 18, 1998, the CEO issued a letter to Hannon stating that the signs cannot advertise BYOB consumption of alcohol at the restaurant. Attachment to PSMF, Exhibit 10. On March 25, 1998, the CEO reconsidered this earlier position and stated that alcoholic beverages could be brought into and consumed by customers at the restaurant (but that signs could not advertise BYOB). Attachment to PSMF, Exhibit 11.

6. March 25, 1998, the CEO, Chair of the Board of Selectmen and Chair of Planning Board received a letter from Ron Cheney complaining that the restaurant was operating in violation of the Town's zoning ordinance. Attachment to PSMF, Exhibit 14. The Planning Board turned the matter over to the CEO, James Gerrish, on April 14, 1998 for "appropriate action." Attachment to PSMF, Exhibit 15.

7. May 27, 1998, DHS approved the septic design for the restaurant to accommodate seating for 44 customers and 5 employees. The CEO, James Gerrish, was sent a copy of this letter. Attachment to PSMF, Exhibit 16. On May 30, 1998,

Gerrish issued a septic permit ("Subsurface Wastewater Disposal System" permit) to handle 21 inside seats and 23 outside seats.[13] **Attachment to PSMF, Exhibit 17.**

8.      January 21, 2000, CEO Steven McDonough issued a cease and desist order ordering Hannon to discontinue operations at the restaurant. **R. 4-5.**

The above evidence demonstrates that prior to Hannon purchasing the Marina and opening the restaurant, he was told that food service was a grandfathered use within the Shoreland District. Between October 1997 and May 1998, the Town issued various permits which acknowledged the expansion of the restaurant and seemed to allow for its presence and use. Almost two years later, the Town changed course and ordered the restaurant to cease and desist operating. Reasonably relying on the Town officials' representations and issuance of permits, Hannon has spent considerable time, energy and money on improving the restaurant. **Hannon Affidavit, Exhibit Q, Attached to Plaintiffs' Reply Brief.** The Town of Shapleigh should therefore be equitably estopped from enforcing the Ordinance.

The clerk may incorporate this judgement in the docket by reference.

Dated:   May 8, 2001

_____
G. Arthur Brennan
Justice, Superior Court

PLAINTIFFS:
Christian Chandler, Esq.
BOX 7320
Portland, ME.   04112

DEFENDANT:
Christopher Vaniotis, Esq.
BERNSTEIN SHUR SAWYER & NELSON
PO BOX 9729
PORTLAND ME   04104-5029

---

[13] Although the permit application for the septic system states that the disposal system is to serve the "store," under the heading "criteria used for design flow" the permit indicates that the disposal system must serve 21 inside seats and 23 outside seats and 5 employees. This permit, therefore, is clearly a septic permit for the restaurant, not the "store."